# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZACHARY BLAIR, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 19-647 |
| | ) | Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| | ) | Re: ECF No. 1 |
| ROBERT GILMORE, *Superintendent, SCI Greene*; THE DISTRICT ATTORNEY OF THE COUNTY OF ALLEGHENY; *and* THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA, | ) ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

## <u>MEMORANDUM OPINION</u>

Zachary Blair ("Petitioner") is a state prisoner currently incarcerated at the State Correctional Institution at Greene ("SCI-Greene") in Waynesburg, Pennsylvania. Petitioner initiated the present matter by filing a Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, ECF No. 1, in which he challenges his 2016 conviction in the Court of Common Pleas of Allegheny County, Pennsylvania, for conspiracy to commit murder in the third degree, in violation of 18 Pa C.S.A. § 903, and carrying a firearm without a license, in violation of 18 Pa C.S.A. § 6106(a)(1). ECF No. 1 at 1; ECF No. 11-1 at 5; ECF No. 11-4 at 1-2. See also Com. v. Blair, Docket No. CP-02-CR-15391-2013. Petitioner pleaded guilty to these offenses as the result of a negotiated plea agreement. In accordance with the plea agreement, Petitioner was sentenced to a term of imprisonment of 15 to 30 years on the conspiracy conviction, with no further penalty on the firearm conviction. ECF No. 1 at 1-2; ECF No. 11-1 at 5; ECF No. 11-4 at 1.

For the reasons stated below, the Petition will be denied, and a certificate of appealability will be denied.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Pennsylvania Superior Court summarized the relevant factual and procedural history of this case as follows.

> On June 23, 2016, [Petitioner] appeared before [the trial court] to plead guilty pursuant to a negotiated plea agreement. [Petitioner] was originally charged in three separate cases and the negotiated plea agreement resolved all three cases. Only two of the cases are germane to this appeal. In one case, [Petitioner] was charged with criminal homicide. The Commonwealth was seeking a conviction for first-degree murder and a sentence of death.[2] However, because [Petitioner] had previously been convicted of homicide, a conviction of third degree murder would have carried a mandatory life sentence. The second case charged firearm possession which was part of the events giving rise to the homicide charge. The firearm charge was originally included in the same information as the criminal homicide charge but was later severed by [the trial court]. Under the terms of the plea agreement, [Petitioner] agreed to plead guilty to one count of conspiracy to commit third degree murder and the firearm offense. The Commonwealth and [Petitioner] both agreed that the appropriate disposition of this case was a state prison sentence of not less than 15 years nor more than 30 years relative to the conspiracy charge. No further penalty was imposed at the firearms count.

PCRA Super. Ct. Op., ECF No. 11-13 at 1-2 (footnote added).

While the state courts did not recite the facts underlying the crimes to which Petitioner pleaded guilty, the prosecution summarized the case that it intended to prove had Petitioner gone

---

[1] Full consent of the parties to proceed before a United States Magistrate Judge was obtained on September 9, 2019. ECF No. 17.

[2] The record before this Court is somewhat inconsistent as to whether Petitioner was facing the death penalty at the time of his guilty plea. However, it is noteworthy that the docket in Petitioner's underlying criminal case indicates that the prosecution withdrew its notice of intent to seek the death penalty on February 17, 2016 – roughly four months before Petitioner entered his plea. ECF No. 11-1 at 8.

to trial during Petitioner's guilty plea colloquy as follows.

> At CC 201316798 and CC 201315391 and CC 201602017, if the Commonwealth would have proceeded to trial, the Commonwealth would have entered as testimony that on August 15, 2013, Pittsburgh police received a call for shots fired at 10:44 p.m. at an address of 529 Lowell, L-o-w-e-l-l, Street in Zone 5 of the City of Pittsburgh.

> The initial officers arrived within two minutes.  At the time they observed an individual later identified as Anthony Wilson on the front steps inside the house. You open the door, walk in; and the steps going up to the second floor, Mr. Wilson was there. He had obvious gunshot wounds to the head and trunk area, and he was determined by the Pittsburgh EMS to be DOA at the scene.

> Mr. Wilson's body was taken to the Allegheny County coroner's office, and Dr. Luckasevic performed an autopsy. On the autopsy he was determined to suffer from three gunshot wounds to the head, one of which was contact; six gunshot wounds to the chest and the trunk area; and four gunshot wounds to the extremities.

> At the crime scene, Pittsburgh police collected a total of 11 cartridge casings and five bullets. When those cartridge casings and bullets were analyzed, it determined that 9 cartridge casings came from one gun, one .40- caliber weapon; two cartridge cases came from another .40-caliber weapon; and one of the bullets that was suitable for comparison was determined to be a .38 or .357, indicating that there were three firearms used in the homicide of Mr. Wilson.

> It was determined that Mr. Wilson died of gunshot wounds to the head and the chest and that the manner of death was homicide.

> Upon investigation, Detective Satler came in contact with two individuals that were sitting outside on Paulson Street prior to gunshots being fired. These individuals indicated that two vehicles had pulled up minutes before the shots were fired. They observed three different individuals getting out of the two vehicles.

> One of the two witnesses identified the defendant, Zachary Blair, as getting out of a black Chrysler sedan, either a Sebring or a 200. When he got out, he walked up onto the sidewalk, dropped a gun, pick up the gun and put it back in his pocket. He had also been sipping out of a Styrofoam cup which he dropped and left at the scene.

> Both individuals said that the three people they saw getting out of these two sedans walked around the corner, which is about a block

and a half to two blocks from 592 Lowell Street. They went inside.

Within minutes they hear several gunshots being fired, and both individuals looked outside their respective windows and saw the three individuals that they saw initially going towards the scene coming back quickly from the scene and getting back in the two vehicles and taking off.

Your Honor, as I said, Mr. Blair was identified by one of those witnesses as the individual who got out of the black Chrysler and dropped the gun. That takes us to -- a time study was done by Detective Satler, where it takes you approximately a minute and 54 seconds to walk from 529 Lowell Street to the area on Paulson Street where the vehicles were parked, and it takes you less than a 1 minute to drive from where those cars were parked to 644 Paulson Street, which is where the defendant was residing at the time, which is a couple blocks down from where the cars were parked.

On August 24, 2013, approximately nine days later, there was a shooting in the Hill District of the City of Pittsburgh. Zone 2 police officers responded.  While en route, they were told that one of the vehicles with one of the shooting victims had gone to Mercy Hospital.

Officer Todd Modena pulled into Mercy Hospital directly behind a red Chrysler 200. When he pulled in behind him, he sees five individuals getting out of the vehicle. The defendant, Zachary Blair, was the driver. There was a front seat passenger known as Delmingo Williams.  And then there were three back seat passengers, a Tyron Harrison, a Maurice Smith and a William Smith.

Maurice Smith had been shot, so the other individuals were carrying him inside the emergency room to be treated. The other four individuals came back out, and Mr. Blair handed his keys to one of the other four people in the car and asked them to move the car.

Officer Modena prevented them from being able to move the car, and ultimately they just parked the car in the emergency room bay, and Officer Modena pulled his patrol vehicle behind the car. At that point Officer Modena and several backup Pittsburgh police officers pulled Mr. Blair, William Smith, Tyron Harrison and Delmingo Williams -- had them sit down outside of Mercy to obtain their identification information and any statements they may have about the Hill District shooting on that day.

While they were discussing this with these individuals, one of the police officers walked up towards the red Chrysler 200 that Zachary

4

Blair had been driving. As he was walking towards the vehicle, Zachary Blair gets up, takes off running, goes basically through the parking lot adjacent to Mercy Hospital and over the Boulevard of the Allies to the cliff. He was ultimately apprehended. He was brought back.

At that point they walked back up to the vehicle, and they noticed a Smith & Wesson pistol in the front seat – front driver's -- I'm sorry. Front passenger's seat floor of the red Chrysler 200. They also observed a shotgun sticking out underneath the front seat through the back in plain view. The officers secured the vehicle. They towed it.

They actually took the two guns they had seen in plain view into possession, and then they obtained a search warrant to search the rest of the car. When they searched the rest of the car, they came across a rental agreement that showed that the Chrysler red 200 had been rented by Zachary Blair on August 24 of 2013.

They also found another .380-caliber firearm in the center rear armrest, and then they found two additional – two Chinese 7.62 semiautomatic rifles in the trunk of the vehicle. All of those firearms were submitted to the crime lab, and they were all in working condition.

Based on the rental agreement, Detective Satler went back to Enterprise Rent-A-Car in Turtle Creek and inquired as to whether Mr. Blair had a rental car on the day of the homicide, August 15 of 2013.

When they pulled the records, it was determined that he had a black 200 Chrysler that he had rented from July 9, 2013, through August 24 of 2013, which would mean he had rented a black 200 on August 15 of 2013. The other thing, Judge, is that Mr. Blair was on house arrest -- he had a window where he was allowed out; but, regardless, the ankle bracelet checked in when he was at home and when he was not.

It showed that Mr. Blair was not at his residence from 8:20 p.m. till 10:50 p.m. but that he showed back home at 10:50 p.m., six minutes after the homicide had been called in. But, as I stated earlier, it was only a couple minutes from the location of the scene and where his car was parked.

The defendant has -- oh, the firearm that was found on the front seat passenger was a .40-caliber Smith & Wesson. That was determined to be one of the three firearms that was used at the homicide. The

nine cartridge casings, .40 calibers, that were collected come back to that gun.

DNA swabbing was conducted on that gun, and they obtained a mixture of DNA off that firearm. The primary contributor was Delmingo Williams, who was the front seat passenger in the red Chrysler 200, and he was determined to be a 1 in 41.7 trillion more probable than coincidental match. However, Mr. Blair's DNA was, in fact, determined to be in there in 1 in 502 more probable than coincidental match in African-Americans.

Finally, Your Honor, with respect to the persons not to possess, the defendant entered a guilty plea to criminal homicide, murder of the third degree, at CC 200312431 before Judge Nauhaus. And, once again, Judge, I don't know if I said it or not, but he did not have a license to carry a firearm on August 15 or August 24 of 2013. With that, the Commonwealth would rest.

Plea Hr'g Tr. dated June 23, 2016, at 45-54; ECF No. 11-11 at 10-13.

Petitioner did not file a direct appeal.  As a result, Petitioner's conviction became final on July 23, 2016.  See Pa. R.A.P. 903.  See also Ellis v. Ricci, No. 09-5124, 2010 WL 1741593, at *1 (D.N.J. Apr. 28, 2010) ("In cases where the defendant does not pursue a timely direct appeal, the sentence becomes final, and the statute of limitations begins to run, on the date on which the time for filing such an appeal expired.") (internal citations and quotation marks omitted).

Petitioner filed a *pro se* petition under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. §§ 9541-9546, on May 17, 2017.[3]  ECF No. 11-5 at 1.  Counsel was appointed, and an amended PCRA petition was filed on September 15, 2017.  ECF No. 11-6 at 1. The PCRA trial court denied relief at a hearing on April 2, 2018.  PCRA Hr'g Tr. dated April 2, 2018, at 89.  Petitioner timely appealed on April 11, 2018.  ECF No. 11-9 at 2.  The Pennsylvania

---

[3] Respondents argue that Petitioner's *pro se* PCRA petition was filed on May 23, 2017.  ECF No. 11 at 21.  However, because Pennsylvania applies the so-called "prisoner mailbox rule" to *pro se* PCRA petitions, see, e.g., Com. v. Little, 716 A.2d 1287, 1288-89 (Pa. Super. Ct. 1998), the effective date of filing appears to be May 17, 2017 – the date on which the certificate of service states that that petition was placed in the prison mailing system at SCI-Greene.  ECF No. 11-5 at 1.

Superior Court concluded that the PCRA trial court did not err, and affirmed the denial of PCRA relief on October 16, 2018.  PCRA Super. Ct. Op., ECF No. 11-13 at 1.  The Pennsylvania Supreme Court denied Petitioner's timely-filed Petition for Allowance of Appeal on March 20, 2019. ECF No. 11-17 at 1.

Pursuant to the prisoner mailbox rule, the instant federal habeas Petition is deemed filed on May 22, 2019.  ECF No. 1 at 16.  See also Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) ("we hold that a pro se prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court.").  Respondents answered the Petition on July 24, 2019.  ECF No. 11.  Petitioner did not submit a Traverse.  See LCvR 2254.E.

The Petition is ripe for consideration.

## II.  CLAIMS

Petitioner is not entirely clear as to the specific grounds for relief that he is raising in the Petition.  The following is a verbatim recitation of the grounds as they appear in the Petition.

Ground One:  Ineffective assistance of plea-counsel extending to level of attorney abandonment.  (1) Actual innocence. (2) Unconstitutional ineffective assistance of counsel at the guilty plea stage. (3) Counsel failed to interview the potential alibi witness.  Delmingo Williams acknowledge [*sic*] control and sole possession of the alleged murder weapon and plead guilty to the same. Key alibi witness Shayonne Ruffin was willing to provide the truth, that she clearly saw and observed the purported mail assailants exit the house in question and Petitioner Zachary Blair was not present. (4) the Plea Court during its colloquy failed to address the factual basis for the plea deal.  ECF No. 1 at 5.

Ground Two:  Violation of rights under Federal and State constitution.  Id. at 7.

Ground Three:  A plea of guilty unlawfully induced.  Id. at 9.

Much of the Ground One is written on the section of the form petition for "supporting facts," however, it is unclear whether and to what extent the apparent compound claims of Ground One are meant to be facts, or independent grounds for relief.  Id. at 5.  That said, Petitioner states

in the Petition that the "supporting facts" of Grounds Two and Three are the same as those of Ground One.  Id. at 7 and 9.  As such, this Court presumes that each of the compound claims of Ground One is meant to attack the constitutional sufficiency of the assistance of his attorneys with respect to Petitioner's guilty plea.  To the extent that they are not, they are procedurally defaulted, as discussed in more detail in Part III.B, infra.

## III. PROCEDURAL ISSUES

Before this Court can address the merits of Petitioner's federal habeas claims, it will address whether the Petition fulfills the applicable procedural requirements, as set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

### A. The AEDPA Statute of Limitations

The first consideration in reviewing a federal habeas corpus petition is whether the petition was timely filed within the applicable statute of limitations.  In 1996, Congress enacted the AEDPA, which generally established a strict one-year statute of limitations for the filing habeas petitions pursuant to 28 U.S.C. § 2254.  The applicable portion of the statute is as follows:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

The United States Court of Appeals for the Third Circuit has held that the statute of limitations set out in Section 2244(d) must be applied on a claim-by-claim basis. Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004), cert. denied sub nom. Fielder v. Lavan, 543 U.S. 1067 (2005). Thus, in analyzing whether a petition for writ habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry. First, the court must determine the "trigger" date for the individual claims raised in the petition. Typically, this is the date that the petitioner's direct review concluded and the judgment became "final" for purposes of triggering the one-year period under Section 2244(d)(1)(A). Second, the court must determine whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute pursuant to Section 2244(d)(2). Third, the court must determine whether any of the other statutory exceptions or equitable tolling should be applied on the facts presented.

In the instant case, Petitioner's plea was accepted, and he was sentenced, on June 23, 2016. Because Petitioner did not file post-sentence motions or a direct appeal, his conviction and sentence became final on the first working day 30 days thereafter – or July 23, 2016. See Pa. R.A.P. 903. As such, July 23, 2016 This is the trigger date of all of Petitioner's claims.

The clock on the AEDPA's one-year statute of limitations began running on that date July 23, 2016, and continued for a period of 298 days – until May 17, 2017 – when Petitioner's *pro se* PCRA petition was constructively filed by virtue of having been placed in the prison mail system at SCI-Greene.   ECF No. 11-5 at 1.   The clock did not begin running again until March 20, 2019, when the Pennsylvania Supreme Court denied *allocatur* with respect to the PCRA petition.   ECF No. 11-17 at 1.   The clock ran for another 63 days, until May 22, 2019, when Petitioner signed the instant federal habeas Petition, and presumably placed it in the prison mail system.   ECF No. 1 at 16.

The total time that the clock was running under Section 2244(d)(1) and (2) on Grounds One, Two, and Three is the sum of 298 days and 63 days – or 361 days.   This is less than one year. Accordingly, these grounds for relief are timely filed based, on the one-year period of limitation set forth in Section 2244(d)(1).

### B.  Exhaustion and Procedural Default

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief.   To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state habeas proceedings, mandamus proceedings, or other available procedures for judicial review.   See, e.g., Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996) (abrogated on other grounds by Beard v. Kindler, 558 U.S. 53, 60-61 (2009)); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996).

Moreover, a petitioner must present every claim raised in the federal habeas petition to the state trial court, intermediate appellate court, and highest available court before exhaustion will be

considered satisfied.  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).  A petitioner shall not be deemed to have exhausted state remedies if he has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c).  The petitioner has the burden of establishing that the exhaustion requirement has been met.  Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).  In the case at issue, it is clear that Petitioner's claims are exhausted at the state court level in the sense that there is no state avenue for relief available to him due to the PCRA's one-year statute of limitations.  See 42 C.S.A. § 9545(b).

However, beyond the question of exhaustion, a federal court may be precluded from reviewing habeas claims under the "procedural default doctrine."  Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor, 96 F.3d at 678; Sistrunk v. Vaughn, 96 F.3d 666, 675 (3d Cir. 1996).  This doctrine is applicable where, *inter alia*, a petitioner's claims are "deemed exhausted because of a state procedural bar[.]"  Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000).  Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system and, in turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment.  Coleman, 501 U.S. at 750.  The PCRA's one-year statute of limitations has been held to be an "independent and adequate" state law ground for denying habeas relief.  Whitney v. Horn, 280 F.3d 240, 251 (3d Cir. 2002).

Respondents concede that Petitioner's claim of ineffective assistance of counsel at Ground One has been exhausted, to the extent that it relates to his plea agreement.  ECF No. 11 at 28.

Respondents interpret Grounds Two and Three to be redundant with that specific ineffective assistance of counsel claim.  Id.  To the extent that they differ, Respondents assert that Grounds Two and Three are procedurally defaulted.  Id.

With respect to the additional subparts of Ground One, Respondents argue that the same are factual bases for relief that were not fairly presented to the Pennsylvania Superior Court, and thus are procedurally defaulted.  Id. at 28-30.

The sole claim raised in Petitioner's counseled PCRA petition relates to ineffective assistance of counsel leading to an involuntary, unknowing, and unintelligently entered guilty plea. ECF No. 11-6 at 7.  Generally, the factual bases underlying this claim in the PCRA proceedings relate to allegations that (1) counsel informed Petitioner that he was not qualified to try the case before the jury; (2) If Petitioner succeeded in state court, his case would be prosecuted in federal court where Petitioner would face a stiffer sentence; (3) counsel would withdraw Petitioner's guilty plea within 10 days, or appeal to have the plea withdrawn.  Id.  Petitioner's PCRA appeal brief to the Superior Court tracks these bases, and added Petitioner's race and appearance as reasons Petitioner's trial counsel stated that he would not be able to successfully try Petitioner's criminal case in state court.  ECF No. 11-11 at 7.

Petitioner's assertions at Ground One in the instant Petition of "(1) Actual innocence. . . . (3) Counsel failed to interview the potential alibi witness.  Delmingo Williams acknowledge [sic] control and sole possession of the alleged murder weapon and plead guilty to the same.  Key alibi witness Shayonne Ruffin was willing to provide the truth, that she clearly saw and observed the purported mail assailants exit the house in question and Petitioner Zachary Blair was not present. (4) The Plea Court during its colloquy failed to address the factual basis for the plea deal[]" were

not presented to or addressed by the Superior Court.  ECF No. 1 at 5.  To the extent that Petitioner

seeks to raise them as grounds for relief, they are procedurally defaulted.[4]

The United States Supreme Court has held that where a petitioner has to follow state

procedure within the required time period, the "federal habeas review of the claims is barred unless

the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged

violation of federal law, or demonstrate that failure to consider the claims will result in a

fundamental miscarriage of justice."  Coleman, 501 U.S. at 750; see also Wainwright v. Sykes,

433 U.S. 72, 86-87 (1977) (failure to follow state's procedural rules results in procedural default,

which bars federal review of petitioner's claims unless he can show cause and prejudice); Hull v.

Freeman, 991 F.2d 86, 90-91 (3d Cir. 1993) (same).  The  Supreme Court in Coleman further stated

that it recognized "the important interest in finality served by state procedural rules and the

significant harm to the States that results from the failure of federal courts to respect them."  501

U.S. at 750.

The Supreme Court has defined "cause" as "some objective factor external to the defense."

Murray v. Carrier, 477 U.S. 478, 488 (1986).  "[A] showing that the factual or legal basis for a

claim was not reasonably available to counsel . . . or . . . some interference by officials" are two

examples, but not an exhaustive list.  Id.  Here, Petitioner has failed to show cause to excuse default

of any ground for relief not presented to the Superior Court.

---

[4] Petitioner appears to have raised at least some of these claims in his *pro se* PCRA petition.  See
ECF No. 11-5.  However, his amended PCRA petition did not address those bases, and that is the
operative petition under Pennsylvania law.  Arnold v. Superintendent SCI Frackville, 322 F. Supp.
3d 621, 638 n.2 (E.D. Pa. 2018).  Moreover, Petitioner's guilty plea forecloses a collateral attack
through habeas of any non-jurisdictional defects in the proceeding "relating to the deprivation of
constitutional rights that occurred prior to the entry of the guilty plea."  Tollett v. Henderson, 411
U.S. 258, 267 (1973).  See also 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus
may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies
available in the courts of the State.").

In order to show a fundamental miscarriage of justice, the Supreme Court requires a petitioner to demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 321 (quoting Murray, 477 U.S. at 496). Under this standard, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup, 513 U.S at 324. Once such evidence is presented, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id. at 327. In this case, Petitioner has adduced no new evidence of his actual innocence, nor do his arguments lead to the conclusion that "it is more likely than not that no reasonable juror" would have convicted him.

Petitioner has demonstrated no reason why his default of subclaims (1), (3), and (4) of Ground One in state court should be excused. Additionally, to the extent that Petitioner raises "(1) Actual innocence" as an attempt to support excusal of his default as a fundamental miscarriage of justice, he has failed to support the same with "new reliable evidence" as required by Schlup. Accordingly, any claims not based on ineffective assistance of counsel not related to Petitioner's plea of guilty – including subclaims (1), (3), and (4) of Ground One – will be dismissed as procedurally defaulted. The same applies to Grounds Two and Three, to the extent that they differ from Petitioner's ineffective assistance of counsel claim with respect to his guilty plea at Ground One.

## IV.  APPLICATION OF MERITS STANDARD OF REVIEW

### A.  Standard of Review

Where the state court has reviewed a federal issue presented to them and disposed of the issue on the merits, and that issue is also raised in a federal habeas petition, the AEDPA provides the applicable deferential standards by which the federal habeas court is to review the state court's disposition of that issue.  See 28 U.S.C. § 2254(d) and (e).

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court expounded upon the standard found in 28 U.S.C. § 2254(d).  The Supreme Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: 1) where the state court decision was "contrary to . . . clearly established Federal law  as determined by the Supreme Court of the United States" or 2) where that state court decision "involved an unreasonable application of[] clearly established Federal law as determined by the Supreme Court of the United States."  Id. at 404-05 (emphasis deleted).  A state court decision can be contrary to clearly established federal law in one of two ways. First, the state courts could apply a wrong rule of law that is different from the rule of law required by the United States Supreme Court.  Second, the state courts can apply the correct rule of law but reach an outcome that is different from a case decided by the United States Supreme Court where the facts are indistinguishable between the state court case and the United States Supreme Court case.  Blackwell, 387 F.3d at 234 (quoting Williams, 529 U.S. at 405-06)

In addition, the United States Court of Appeals for the Third Circuit has explained that "Circuit precedent cannot create or refine clearly established Supreme Court law, and lower federal courts 'may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.'"  Dennis v. Sec., Pa. Dep't of Corrections, 834 F.3d 263, 368 (3d Cir. 2016) (quoting

Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam)).  As the Supreme Court has further explained: "[s]ection 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." White v. Woodall, 572 U.S. 415, 428 (2014).

The AEDPA also permits federal habeas relief where the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Specific factual determinations by the state court are that are subsidiary to the ultimate decision to grant post-conviction relief are subject to the presumption of correctness, and must be overcome by Petitioner by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  See also Lambert, 387 F.3d at 235-236.  The Third Circuit has declined to adopt a "rigid approach to habeas review of state fact-finding." Id. at 236 n.19.  If a state trial court and appellate court make conflicting factual findings, the habeas court must defer to the findings of the higher court – regardless of the propriety of those findings under state law – unless they are rebutted by clear and convincing evidence.  See Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006).

Finally, it is a habeas petitioner's burden to show that the state court's decision was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts.  Ross v. Atty. Gen. of State of Pennsylvania, No. 07-97, 2008 WL 203361, at *5 (W.D. Pa. Jan. 23, 2008).

### B. Ineffective Assistance of Counsel

Petitioner asserts that his counsel was ineffective for allegedly coercing or inducing him into pleading guilty.  ECF No. 1 at 5 and 9.  It is undisputed that this ground was exhausted in the state courts.  Therefore, the AEDPA's deferential standard of review applies.

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial."  Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).  The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: (1) counsel's performance was unreasonable; and (2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687.  To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct.  Id. at 690.

The Superior Court applied Pennsylvania's three-part effectiveness test when it adjudicated Petitioner's PCRA claim.  PCRA Super. Ct. Op., ECF No. 11-13 at 3-4.  This test has been found by the Third Circuit as not contrary to Strickland.  Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000).  Thus, the Superior Court's decision is not contrary to Strickland.

The first prong of the Strickland test requires a petitioner to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy."  Id. at 689.  The question is not whether the defense

17

was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. Id. Instead, Petitioner is required to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104 (2001) (quoting Strickland, 466 U.S. at 687). "Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." Hill v. Lockhart, 474 U.S. 52, 56 (1985) (internal citation of quotes omitted).

The second prong requires a petitioner to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. Id.

In order to establish prejudice in the context of a guilty plea, a petitioner must "show [that] the outcome of the plea process would have been different with competent advice." Lafler v. Cooper, 566 U.S. 156, 163 (2012); see also Hill, 474 U.S. at 59 (requiring a petitioner to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial"). A petitioner makes this showing by establishing not only that he would not have pleaded guilty and instead would have proceeded to trial if he had been properly advised, but also that "a decision to reject the plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. 356, 372 (2010).

Further, with regard to a challenge to a guilty plea in a federal habeas action, the United States Supreme Court has stated:

> A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence. Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary. If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack.

United States v. Broce, 488 U.S. 563, 569 (1989). See also Lesko v. Lehman, 925 F.2d 1527, 1537 (3d Cir. 1991). The voluntariness of a plea can only be determined by considering all of the relevant circumstances surrounding it. Brady v. United States, 397 U.S. 742, 749 (1970). Although not insurmountable, a criminal defendant's sworn testimony that his or her plea was not coerced constitutes strong evidence that the guilty plea was voluntarily given. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity.").

Here, Petitioner's claim of ineffective assistance of counsel turns on the assertion that his guilty plea was involuntary, unknowing, and unintelligent because he was coerced or induced into entering the plea by his counsel. ECF No. 1-1 at 4. Petitioner's factual bases for relief are summarized as follows:

- Counsel promised to file a motion or appeal to withdraw the guilty plea, and failed to do so. ECF No. 1-2 at 1 and 4. Someone "acting on behalf of" Petitioner contacted counsel one day after sentencing, informing counsel that Petitioner wanted to withdraw his plea; however, counsel never filed a motion or appeal of the plea, or followed up with Petitioner about it. Id.

- Trial counsel advised Petitioner that the prosecution had threatened to refer Petitioner's firearms charges for federal prosecution if he was found not guilty in state court, and that Petitioner would face a significantly longer sentence if convicted in federal court. Id. at 1-3. Petitioner's trial counsel did not confirm with the U.S. Attorney's office whether the prosecution's threat was true. Id. at 3.

19

- Counsel exploited Petitioner's ethnic and social status.  ECF No. 1-1 at 5.  Counsel told Petitioner that he was "too big and intimidating looking [and] there is no way a jury is going to find me not guilty because of my appearance."   ECF No. 1-2 at 2.  Additionally, counsel told Petitioner that "[y]ou are African American, you are big, and you look like someone who would end up shooting somebody.  And [counsel] was concerned that the jury was going to be afraid of [Petitioner]."  Id.

- At some point during a 45 minute conversation in the "back sheriff room" before the parties were to pick a jury, counsel told a sheriff's deputy to "tighten [the] handcuffs" on Petitioner "because [counsel] didn't know what [Petitioner] was going to do," leading Petitioner to feel "boxed in."  ECF No. 1-2 at 3; ECF No. 11-11 at 21-22.  PCRA Hr'g Tr. dated Apr. 2, 2018 at 15-16.

These factual bases were presented to the PCRA trial court, which held an evidentiary hearing on April 2, 2018, at which Petitioner and his trial counsel – Thomas Farrell and Michael Machen – each testified.  PCRA Trial Ct. Op., ECF No. 11-10 at 92-93; see also, generally, PCRA Hr'g Tr. dated April 2, 2018.  In its opinion, the PCRA trial court described Petitioner's testimony as follows.

> Petitioner testified at his PCRA hearing that his trial counsel (he had two lawyers due to the fact that the Commonwealth had filed a notice seeking the death penalty in this case) had implored him to plead guilty because they convinced him that his trial could not be won because he was African-American and had a "thuggish" appearance that would have been offensive to a prospective jury.  He further testified that his trial counsel had convinced him he should accept the tendered plea agreement because the Commonwealth had threatened to withdraw his firearm offenses and refer them for federal prosecution.   According to Petitioner, his trial counsel informed him that he would have faced a very stiff, additional sentence if he were convicted of the federal charges.  He also claims that his trial counsel promised him that they would be able to vacate his guilty plea within ten days after he entered it by filing a motion with this Court to withdraw the guilty plea.   But for these representations, Petitioner asserts, he would have proceeded to trial and not have entered into the plea agreement.

PCRA Trial Ct. Op., ECF No. 11-10 at 3.  See also PCRA Hr'g Tr. dated April 2, 2018 at 4-25.

The PCRA trial court summarized the testimony of Petitioner's trial counsel.

> Trial counsel Thomas Farrell testified at the PCRA hearing. Attorney Farrell did acknowledge that he did relay his concerns about Petitioner's appearance to the petitioner. Attorney Farrell testified that he wanted Petitioner to make a good appearance for jury selection. He also had discussions with Petitioner in order to inform Petitioner about some possible concerns as to how the jury may view him at trial if he didn't do something to soften his appearance for trial. Mr. Farrell clearly testified that the discussions concerning Petitioner's appearance were part of discussion about trial strategy and not about acceptance of a guilty plea in this case. Attorney Farrell and trial counsel Michael Machen both testified that they discussed the threat of federal prosecution with Petitioner. They testified that they expressed their concerns that Petitioner could have faced a very lengthy, additional sentence if the federal government adopted the firearms case. Again, the discussions were not conducted in order to induce the petitioner to plead guilty. They were discussions designed to ensure that the petitioner was fully informed of all risks associated with proceeding to trial. Finally, Attorney Farrell and Attorney Machen both testified that they did not promise Petitioner that they would file a motion to secure a withdrawal of his guilty plea. On the contrary, both attorneys testified that no such conversations ever occurred. This Court found the testimony of Attorney Farrell and Attorney Machen to be credible.

PCRA Trial Ct. Op., ECF No. 11-10 at 4.  See also PCRA Hr'g Tr. dated April 2, 2018 at 32-63

The PCRA trial court found Petitioner's trial counsel's testimony to be credible.  PCRA Trial Ct. Op., ECF No. 11-10 at 4.  Based on their testimony, and Petitioner's oral and written plea colloquy, the PCRA trial court denied relief.  Id. at 94-97.

On appeal, the Superior Court affirmed the PCRA trial court's decision, relying both on trial counsel's testimony at the PCRA hearing, and Petitioner's written and oral guilty plea colloquies.  PCRA Super. Ct. Op., ECF No. 11-13 at 5-8.  Of note, the PCRA Superior Court found that:

> Importantly, during the oral colloquy, [Petitioner] indicated that he was not forced into pleading guilty, and that he was satisfied with counsel's representation. [Plea Hr'g Tr. dated June 23, 2016,] at 42-45.  [Petitioner] acknowledged that he decided to exchange his rights, including the right to defend the charges brought against him, for a favorable sentence of 15 to 30 years of incarceration, where, if convicted following a jury trial, [Petitioner]  would have faced a life sentence or possibly the death penalty. Id. at 33-36, 40-41. [Petitioner] stated that he understood the ramifications of pleading guilty and that he was entering his plea on his own volition. Id. at 44.

PCRA Super. Ct. Op., ECF No. 11-13 at 7 (bold and italics removed, underscore added).

A review of Petitioner's guilty plea colloquies provides ample support for the Superior Court's decision relative to his PCRA appeal.  Petitioner completed a written colloquy prior to his oral colloquy.  ECF No. 11-3 at 1-10.  See also Plea Hr'g Tr. dated June 23, 2016, at 41.  The written colloquy included a summary of Petitioner's rights at trial on the first page, as well as 68 written questions to which Petitioner was required to answer "yes" or "no."  Petitioner answered each question by hand, and in writing.  A sample of questions to which Petitioner answered "yes" includes:

> 6. Have you discussed with your attorney the elements of each charged offense?
>
> 7. Have you discussed with your attorney the factual basis of each charged offense?
>
> ***
>
> 24. By pleading guilty, you are admitting you committed the crime. You are stating that you do not challenge or dispute the charges against you.  Do you fully understand this?
>
> ***
>
> 35. In order to appeal your conviction that results from your plea of guilty, you must file in writing your motion seeking to withdraw your pela, either prior to sentencing or within ten (10) days after sentencing and state on or more of the four (4) grounds listed below as the basis for a motion to withdraw your plea:
>
> (a) Your plea was not knowing, intelligent and voluntary'

22

(b) that your crime was not committed within the jurisdiction of this Court, i.e. not committed within Allegheny County;

(c) That the sentence of this Court is illegal; and/or,

(d) that your attorney was ineffective and incompetent.

If you do not file this motion within the proscribed time limits, you will give up this right.  Do you fully understand this?

\*\*\*

61. Are you satisfied with the legal advice and legal representation of your attorney?

62. Have you had ample opportunity to consult with your attorney before entering your plea, and are you satisfied that your attorney knows all of the facts of your case and has had enough time within which to check any questions of fact or law which either you or your attorney may have about the case?

63. Has your attorney gone over with you he meaning of the terms of this document?

\*\*\*

67. If you are entering a plea of guilty, you admit that you committed the crime(s) with which you are charged and to which you are pleading guilty.  Do you fully understand that?

ECF No. 11-3 at 2, 5, 6, and 9.  Each page either was signed or initialed by Petitioner.  Id. at 1-10.

During the plea hearing, the trial court conducted an oral colloquy of Petitioner.  Plea Hr'g Tr. dated June 23, 2016, at 31-55.  As part of the oral colloquy, the Court asked several of the same questions that had been answered in the written colloquy, and additional questions as well.  Some of these questions included whether Petitioner was the individual who filled out and signed the written colloquy, id. at 41-42; whether Petitioner read and understood the written colloquy before signing it, id. at 41; whether Petitioner's written answers were truthful, id. at 42; whether Petitioner had enough time to discuss his cases with his attorneys, id. at 37 and 44; and whether Petitioner was satisfied with his attorneys' performance, id. at 45.  Petitioner answered affirmatively to each of these queries.  The trial court explained the maximum sentences that Petitioner could face if he

23

were convicted on any of his charges at trial.[5]  Id. at 33-37.  Petitioner denied having been forced

plead guilty, or that anyone had made him any promises outside of the plea agreement in order to

convince him to plead guilty.  Id. at 43-44.  Petitioner confirmed that he was pleading guilty of his

own free will.  Id. at 44.  The trial court then found that Petitioner made a "knowing, voluntary

and intelligent waiver" of his rights in his three pending criminal cases.  Id. at 45.

Additionally, after the prosecution's recitation of the facts that it intended to prove had

Petitioner gone to trial, Petitioner affirmed that he had no additions or corrections that he wished

to make, and the trial court accepted his guilty plea.  Id. at 54.  After waiving a pre-sentence report,

id. at 58, Petitioner was sentenced according to the terms of the plea agreement on June 23, 2016.

Id. at 58-59.  See also ECF No. 11-4 at 1.

The Superior Court's PCRA decision addressed both the performance of Petitioner's trial

counsel, PCRA Super. Ct. Op., ECF No. 11-13 at 6-7, as well as any alleged prejudice as to

whether Petitioner's plea was voluntarily entered.  Id. 7-8.

Upon review, this Court finds that Petitioner has failed to show that the Superior Court's

decision to deny PCRA relief was the result of an unreasonable application of the Strickland

standard, or an unreasonable determination of facts based on evidence presented in the state court

proceeding.[6]  28 U.S.C. § 2254(d)(1) and (2).  Petitioner has not provided clear and convincing

---

[5] Contrary to the Superior Court's statement that "[t]he Commonwealth was seeking a conviction for first-degree murder and a sentence of death[,]" PCRA Super. Ct. Op., ECF No. 11-13 at 1, the trial judge during Petitioner's oral guilty plea colloquy stated that Petitioner faced a sentence of "life without parole" if he were convicted of first degree murder.  Plea Hr'g Tr. dated June 23, 2016, at 34.

[6] The undersigned acknowledges that the recitation of the factual background of Petitioner's case by the Superior Court at least arguably incorrectly states that Petitioner faced a potential death sentence at the time of his plea.  PCRA Super. Ct. Op., ECF No. 11-13 at 1.  This arguably could call into question the Superior Court's analysis of the prejudice prong of Strickland – i.e., whether Petitioner would have entered the guilty plea in the first place.  However, this still fails to support

evidence necessary to overcome the presumption of correctness of the credibility determinations made by the PCRA trial court, and relied upon by the Superior Court, which support the conclusion that Petitioner's trial Counsel was not constitutionally deficient.  See Strickland, 466 U.S. at 688. The same is true of the knowing, voluntary, and intelligent nature of his plea, which is supported by the testimony at his PCRA hearing, and the thorough written and oral colloquies discussed at Part I, supra.[7]  In light of AEDPA's stringent standard, federal habeas relief must be denied.

---

habeas relief under Section 2254(d) because the analysis of the performance prong of Strickland is unchanged.  Moreover, a review of the record indicates that the death penalty was not discussed as a potential maximum sentence during Petitioner's oral colloquy.  Plea Hr'g Tr. dated June 23, 2016, at 33-37.  Petitioner was facing the possibility of life imprisonment without parole if convicted, id. at 33-34, as well as the possibility of federal firearms charges.  Additionally, and as stated above, Petitioner has failed to overcome the presumption of correctness of the PCRA trial court's credibility determinations. 28 U.S.C. § 2254(e)(1).  Thus, based on the entire record before this Court, as discussed above, Petitioner has failed to show a constitutional violation even if *de novo* review were to be applied.  28 U.S.C. § 2254(a); see also, e.g., Vickers v. Sup't Graterford SCI, 858 F.3d 841, 848-49 (3d Cir. 2017).

[7] To the extent that Ground One is predicated on counsel's failure to file a motion or appeal to withdraw the guilty plea, the evidence that Petitioner's plea was knowing, voluntary, and intelligent would preclude relief.  United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."); Ross v. Dist. Attorney, 672 F.3d 198, 211 n.9 (3d Cir. 2012) ("'counsel cannot be deemed ineffective for failing to raise a meritless claim'") (quoting Werts v. Vaughn, 228 F.3d 178, 202 (3d Cir. 2000)).  Courts within this Circuit have determined that where it would be fruitless to challenge a guilty plea, counsel is not ineffective in failing to file post-sentence motions raising such a meritless claim.  See, e.g., Dunyan v. Ferguson, No. 16-5362, 2017 WL 9517561, at *6 (E.D. Pa. June 30, 2017), report and recommendation adopted, 2018 WL 2763334 (E.D. Pa. June 8, 2018); Sanchez v. Overmyer, No. 15-5303, 2016 WL 6836960, at *6-7 (E.D. Pa. Oct. 31, 2016), report and recommendation adopted, 2016 WL 6821898 (E.D. Pa. Nov. 18, 2016); Armstrong v. Winstead, No. 12-2367, 2012 WL 7170400, at *5-7 (E.D. Pa. Oct. 31, 2012), report and recommendation adopted, 2013 WL 638612 (E.D. Pa. Feb. 20, 2013); Lincoln v. Palakovich, No. 07-1373, 2007 WL 9619686 at *4 (E.D. Pa., June 13, 2007).  Accordingly, Petitioner's trial counsel was not ineffective in failing to challenge the voluntariness of his guilty plea in a post-sentence motion or direct appeal.

## V.  CERTIFICATE OF APPEALABILITY

A certificate of appealability will be denied, as Petitioner has failed to make "a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).  See also Slack v. McDaniel, 529 U.S. 473, 484-85 (2000).

An appropriate Order follows.


Dated: August 22, 2022                    BY THE COURT:


                                          **_/s/ Maureen P. Kelly_**
                                          MAUREEN P. KELLY
                                          UNITED STATES MAGISTRATE JUDGE




cc      ZACHARY BLAIR
        FT-3513
        SCI Greene
        175 Progress Drive
        Waynesburg, PA 15370


26